## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF MICHIGAN
### DETROIT DIVISION

LINDA WILLIAMS,

                  Plaintiff,

    v.

EXPERIAN INFORMATION
SOLUTIONS, INC., TRANS UNION
LLC, MIDLAND CREDIT
MANAGEMENT, INC.,

              Defendants.

Civil Action No.:

**JURY TRIAL DEMANDED**

## COMPLAINT

Linda Williams ("Plaintiff" or "Ms. Williams") brings this action on an individual basis, against Experian Information Solutions, Inc. ("Experian"); and Trans Union, LLC ("Trans Union") (collectively, the "Credit Bureau Defendants"); as well as Midland Credit Management, Inc. ("Midland") (all defendants collectively, "Defendants") for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et. seq.*, arising out of the mixing Plaintiff's credit file with that of another consumer. Plaintiff also alleges Defendant Midland has violated her rights

as provided by the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692, *et seq.* by collecting on a debt she did not owe.

## **INTRODUCTION**

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning

2

individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.      "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

7.      Congress made the following findings when it enacted the FCRA in 1970:

> (a)     The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

(b)     An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

(c)     Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

(d)     There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).

8.      Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter."   15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

9.      The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him

4

unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec.

36570 (1970)] (emphasis added).

10.     Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. § 1681 *et. seq.*, ("FCRA"), the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

11.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

12.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with

fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C.

§ 1681(a)(4).

13.     The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

14.     A recurring and *known* issue within the credit reporting industry is the creation of "mixed files."

15.     A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

16.     "Mixed files" create a false description and representation of a consumer's credit history.

17.     The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

18.     Mixed files are not a new phenomenon. The Credit Bureau Defendants have been on notice of the existence of mixed files, and the fact that their procedures

for creating credit files, including their matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

19.     More recently, the Credit Bureau Defendants have been the subject of numerous state attorney general actions relating to their mixed file problem.

20.     For example, in 2015, the New York Attorney General filed charges and settled claims with the Credit Bureau Defendants over mixed files.[1] *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*

21.     Notwithstanding the Credit Bureau Defendants' notice and being subject to repeated enforcement actions, mixed files continue to occur despite consumers' unique personal identifying information, such as Social Security numbers, date of birth, and addresses.

22.     Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both.  This occurs when a consumer's file is

---

[1] *A.G. Schneiderman Announces Groundbreaking Consumer Protection Settlement With The Three National Credit Reporting Agencies*, Office of the N.Y. State Att'y Gen., (Mar. 9, 2015) https://ag.ny.gov/press-release/2015/ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three (last visited Sept. 23, 2024).

mixed with that of another consumer, and either of those consumers applies for credit, housing, insurance, or employment, and the Credit Bureau Defendants sell information pertaining to one consumer in response to the application of the other.

23.     The Credit Bureau Defendants have been sued thousands of times wherein an allegation was made that the Credit Bureau Defendants violated the FCRA.  Moreover, the Credit Bureau Defendants are sued, at a minimum, hundreds of times each year wherein an allegation is made that the Credit Bureau Defendants mixed a consumer's credit file with that of another consumer.

24.     FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

25.     For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case NO. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes.  The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages.  Despite the verdict, the Credit Bureau Defendants continue to mix consumers' credit files with other consumers' credit files.

26.     In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in

punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes. Despite the verdict, the Credit Bureau Defendants continue to mix consumers' credit files with other consumers' credit files.

27.     In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Miller' numerous disputes.  Despite the verdict, the Credit Bureau Defendants continue to mix consumers' credit files with other consumers' credit files.

28.     More recently, a jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone.  *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom*.  *Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 2020). Despite the verdict, the Credit Bureau Defendants continue to mix consumers' credit files with other consumers' credit files.

29.     "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong evidence is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

30.     No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

31.     Notably, the Federal Trade Commission has specifically warned consumer reporting agencies, including Experian and Trans Union, to review their procedures when a mixed file occurs.

32.     Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

33.     Plaintiff's claims arise out of the Credit Bureau Defendants' blatantly inaccurate credit reporting, wherein the Credit Bureau Defendants published in a

consumer report about Plaintiff the information of another consumer because the Credit Bureau Defendants mixed Plaintiff's credit file with that of an unrelated consumer.

34.      Further, Plaintiff's claims also arise out of the Credit Bureau Defendants' blatantly inaccurate credit reporting, wherein they permitted the impermissible access to Plaintiff's credit file when it published a consumer report about Plaintiff in response to a credit application submitted by and pertaining to an unrelated consumer because the Credit Bureau Defendants mixed Plaintiff's credit file with that of an unrelated consumer.

35.      Accordingly, Plaintiff brings claims against the Credit Bureau Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b); and against the Credit Bureau Defendants for selling Plaintiff's credit report to third parties, whom did not have a permissible purpose to Plaintiff's credit report, in relation to the credit application of an unrelated consumer, in violation of the FCRA, 15 U.S.C. § 1681b(a).

36.      Further, Plaintiff also brings claims against the Midland, for its conduct and violations under the FDCPA, 15 U.S.C. § 1692 *et seq.*

37.      As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendants for their willful and/or

negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## **PARTIES**

38.    Linda Williams ("Plaintiff" or "Ms. Williams") is a natural person residing in Oak Park, Michigan, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c) and 15 U.S.C. § 1692a(3).

39.    Experian Information Solutions, Inc. ("Experian") is a corporation with a principal place of business located at 475 Anton Boulevard, Costa Mesa, California 92626, and is authorized to do business in the State of Michigan, including within this District.

40.    Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

41.    Trans Union, LLC ("Trans Union") is a limited liability company with a principal place of business located at 555 West Adams Street, Chicago, Illinois 60661 and is authorized to do business in the State of Michigan, including within this District.

42.    Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling,

evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

43.    The information the Credit Bureau Defendants collect, maintain, and sell includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans.  The Credit Bureau Defendants also collect consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

44.    The Credit Bureau Defendants collect and maintain such information about consumers, whether consumers like it or not.  Consumers do not have a choice as to whether the Credit Bureau Defendants collect and maintain information about them.  Not only that, but consumers cannot remove information that the Credit Bureau Defendants collect and maintain about them from the Credit Bureau Defendants' databases. Further, the Credit Bureau Defendants sell that information about consumers for their unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that the Credit Bureau Defendants sell.

45.    Midland Credit Management, Inc. ("Midland") is a debt collector with a principal place of business located at 350 Camino De La Reina, Suite 300, San Diego, CA 92108, and is authorized to do business in the State of Michigan, including within this District.

46.     Midland is a "Furnisher" as defined in 12 CFR 1022.41.   Midland regularly furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report.   A data furnisher, such as Midland, is an entity that reports information about consumers to consumer reporting agencies ("CRAs"), which may include credit bureaus, tenant screening companies, check verification services, and medical information services, etc.   Like CRAs and data users, data furnishers have legal obligations and rules that must be upheld & followed pursuant to 15 U.S.C. § 1681s-2b of the FCRA.

47.     Midland is also a "debt collector," as defined in 15 U.S.C. § 1692a(6).

## JURISDICTION AND VENUE

48.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331, as Plaintiff alleges violations of the FCRA and FDCPA, federal laws. *See* 15 U.S.C. § 1681 *et seq*. and 15 U.S.C. § 1692 *et seq*.

49.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## SUMMARY OF THE FAIR CREDIT REPORTING ACT

50.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the

rights of consumers to fairness and accuracy in the reporting of their credit information.

51.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

52.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

53.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

54.     Similarly, the FCRA also imposes a duty upon the Furnishers, such as Midland, to investigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies.  (15 U.S.C. § 1681s-2b).

55.     The FCRA provides consumers with a private right of action against consumer reporting agencies, such as the Credit Bureau Defendants, and data furnishers such as Midland, that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**THE CREDIT BUREAU DEFENDANTS' PROCESSING OF CREDIT INFORMATION**

56.     The Credit Bureau Defendants regularly receive information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

57.     These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

58.     The Credit Bureau Defendants collect information from thousands of furnishers.

59.     The process by which the Credit Bureau Defendants receive, sort, and store information is largely electronic.

60.     Furnishers report credit information to the Credit Bureau Defendants through the use of coded tapes that are transmitted to the Credit Bureau Defendants on a monthly basis through software known as Metro 2.

61.     The Credit Bureau Defendants take credit information reported by furnishers and create consumer credit files.

62.     The Credit Bureau Defendants maintain credit files on more than 245 million consumers.

63.     Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

## THE CREDIT BUREAU DEFENDANTS' MIXED FILE PROBLEM

64.     The Credit Bureau Defendants know that different consumers have similar names.

65.     The Credit Bureau Defendants know that different consumers can have similar Social Security numbers.

66.     The Credit Bureau Defendants know that different consumers with similar names can also have similar Social Security numbers.

67.     The Credit Bureau Defendants know that public records often do contain identifying information such as Social Security numbers or dates of birth.

68.     The Credit Bureau Defendants match tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

69.    The Credit Bureau Defendants accomplish this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules.

70.    From time to time, the Credit Bureau Defendants' matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what's commonly known in the credit reporting industry as a mixed or merged credit file.

71.    Mixed files are not a new phenomenon.  In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual consent decrees with each of the major CRAs, specifically including the Credit Bureau Defendants, regarding their significant failures and deficiencies with respect to mixed files.

72.    Despite the Credit Bureau Defendants' long-standing and specific knowledge of the mixed file problem, Plaintiff's credit reports were still generated by the Credit Bureau Defendants containing information belonging to another consumer.

73.    A mixed or merged credit file is the result of the Credit Bureau Defendants' inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

74.    There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms and/or database rules used by the Credit Bureau Defendants to match personal identifying information and credit information, including public record information, to a particular consumers' credit file.

75.    The success or failure of these algorithms or rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to the Credit Bureau Defendants.

76.    A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to the Credit Bureau Defendants.

77.    Accordingly, the database rules determine which credit files are selected by the algorithm and merged to create a complete consumer report.

78.    Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

/ /

## FACTUAL ALLEGATIONS

### Plaintiff's Tax Refund is Withheld

79.    On or about March 22, 2024, Plaintiff received a Notice of Income Tax Refund Used for Debts from the Michigan Department of Treasury (the "Notice").

80.    The Notice informed Plaintiff that her 2023 income tax refund in the amount of $721.00 was being withheld based on a debt she purportedly owed to Midland Credit Management Inc. ("Midland").

81.    The Notice indicated there was a garnishment order related to a lawsuit filed by Midland in the 45th District Court of Michigan for a debt in the amount of $5,198.16.

82.    Plaintiff was shocked as she was completely unaware of any account with Midland, any debt owed in the amount of $5,198.16, and any lawsuit allegedly filed against her.

83.    Plaintiff was shocked and concerned that she owed any purported debt to Midland.

84.    Shortly thereafter, Plaintiff began calling Midland on an almost daily basis trying to get her money back.

85.    A Midland representative admitted to Plaintiff that they did not believe the account belongs to her. However, the representative said that there is nothing Midland can do about it.

86.     Plaintiff also sent certified letters to Midland, Midland's attorney of record in the underlying matter (Elizabeth M. Smith), Midland's Chief Compliance Officer, and the Michigan Department of Treasury and explained the situation.

87.     Unfortunately, Plaintiff did not receive a response from any of the foregoing individuals/entities.

88.     Plaintiff then called Identity Force, an identity protection service she had signed up for, and talked to a representative who reviewed her Trans Union credit report with her.

89.     The representative informed Plaintiff that the Midland account was appearing on her Trans Union credit report.

90.     The Identity Force representative also instructed Plaintiff to review her Equifax and Experian credit reports to see if the Midland account was appearing on them as well.

**Plaintiff's Mixed Credit File as of May 13, 2024**

91.     On May 13, 2024, Plaintiff viewed a copy of her credit file from Trans Union.

92.     Upon reviewing the contents of the Trans Union credit file, Plaintiff was confused by the appearance of several pieces of information that did not belong to Plaintiff at all.

93.     Specifically, Trans Union was reporting the following account which does not belong to Plaintiff:

> (a)     Midland Credit Management
>         Account Number: 30851XXXX
>         Date Opened: October 21, 2020

("Disputed Midland Account")

94.     Further, Trans Union was reporting the following name which Plaintiff has never utilized:

> (a)     Linda J. Walker

95.     Further, Trans Union was reporting the following phone numbers which do not belong to Plaintiff:

> (a)     (***) ***-5873
>
> (b)     (***) ***-1692

96.     By reporting the aforementioned credit account and other personal information in the credit file presumably about Plaintiff, despite the fact that the account and information do not belong to Plaintiff, Trans Union failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit file and consumer reports, in violation of 15 U.S.C. § 1681e(b).

97.     Further, Trans Union was also reporting the following account inquiries, which related to an entity with whom Plaintiff does not have an account relationship:

(a)     Midland Credit Management, May 5, 2024; March 3, 2024; January 7, 2024; November 8, 2023; September 10, 2023; July 22, 2023; May 2, 2023; March 3, 2023 January 3, 2023; November 3, 2022; August 27, 2022; May 27, 2022

98.     Plaintiff did not apply for credit with the aforementioned entity and does not have a relationship with the aforementioned entity.  Trans Union did not have a permissible purpose for furnishing information about Plaintiff to the above-referenced entity on the above-referenced dates.

99.     Upon information and belief, the above-referenced inquiries were related to credit application(s) and/or account(s) opened by an unrelated consumer.

100.    Upon information and belief, the above-referenced inquiries are not the only times that Trans Union published information about Plaintiff in response to credit applications submitted by an unrelated consumer.

101.    As Plaintiff had not authorized the above-referenced entity to request Plaintiff's credit report from Trans Union on the above-referenced dates in 2022, 2023, and 2024, nor did Plaintiff enter into any business transaction or relationship which otherwise may have provided a basis for the entity to secure a copy of

Plaintiff's credit report from Trans Union, Trans Union disclosed information about Plaintiff to the above-referenced entity without a permissible purpose and in violation of 15 U.S.C. § 1681b(a).

## Plaintiff's Mixed Credit File as of July 2024

102.   In or around July 2024, Plaintiff viewed a copy of her credit file from Experian and non-party Equifax.

103.   Upon reviewing the contents of her Equifax credit file, Plaintiff was relieved to see that non-party Equifax was not reporting the Disputed Midland Account or any other accounts that did not belong to her.

104.   However, upon reviewing the contents of her Experian credit file, Plaintiff was dismayed by the appearance of several pieces of information that did not belong to Plaintiff at all.

105.   Specifically, Experian was reporting the following accounts which do not belong to Plaintiff:

> (a)   MDT/People Driven CU
> Account Number: 430082XXXXX
> Date Opened: January 10, 2023
>
> (b)   MDT/People Driven CU
> Account Number: 430082XXXXX
> Date Opened: January 10, 2024
>
> (c)   1st Progress/TSYS/VT
> Account Number: 544303XXXXXXXXXX
> Date Opened: October 19, 2023

(d)     Comenity Bank/Jared
Account Number: 778850XXXXXXXXXX
Date Opened: July 30, 2021

(e)     Comenitycb/Gardner White
Account Number: 578098XXXXXXXXXX
Date Opened: January 25, 2020

(f)     Kohls/Capone
Account Number: 639305XXXXXXXXXX
Date Opened: August 25, 2023

(g)     MDT/People Driven CU
Account Number: 430082XXXXX
Date Opened: October 5, 2022

(h)     Self Financial/Lead Bank
Account Number: CBA000XXXXXXXXXXXXXX
Date Opened: October 10, 2023

(i)     Credit Collection Services
Account Number: 803530X
Date Opened: December 21, 2023

(j)     Jefferson Capital Systems
Account Number: 377047570....
Date Opened: December 7, 2023

("Disputed Experian Accounts").

106.   Further, Experian was reporting the following name which Plaintiff has

never utilized:

(b)     Linda Walker

107.   Further, Experian was reporting the following addresses which do not

belong to Plaintiff:

(a)    ***** Tulane Ave., Farmington Hills, MI 48336-3656

(b)    ***** Berg Rd., Southfield, MI 48033-6614

108.   Further, Experian was reporting the following birth year, which is not the year in which Plaintiff was born:

(a)    1955

109.   Further, Defendant Experian was reporting the following employer which Plaintiff has never worked for:

(a)    R1RCM

110.   By reporting the aforementioned credit accounts and other personal information in the credit file presumably about Plaintiff, despite the fact that the accounts and information do not belong to Plaintiff, Experian failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit file and consumer reports, in violation of 15 U.S.C. § 1681e(b).

111.   In addition, Experian was also reporting the following account inquiries, relating to entities with whom Plaintiff does not have an account relationship:

(a)    Kohls Capone, Aug 25, 2023

(b)    MDT/ People Driven, Jan 8, 2024

(c)    MDT/ People Driven, Dec 20, 2022

(d)      MDT/ People Driven, Sep 30, 2022

112.   Plaintiff did not apply for credit with any of the aforementioned entities and does not have a relationship with any of the aforementioned entities.  Experian did not have a permissible purpose for furnishing information about Plaintiff to the above-referenced entities on the above-referenced dates.

113.   Upon information and belief, all four of the above-referenced inquiries were initiated by credit applications submitted by an unrelated consumer.

114.   Upon information and belief, the above-referenced inquiries are not the only times that Experian published information about Plaintiff in response to credit applications submitted by an unrelated consumer.

115.   As Plaintiff had not authorized any of the above-referenced entities to request Plaintiff's credit report from Experian on the above-referenced dates in 2022, 2023, and2024, nor did Plaintiff enter into any business transaction or relationship which otherwise may have provided a basis for those entities securing a copy of Plaintiff's credit report from Experian, Experian disclosed information about Plaintiff to the above-referenced entities without a permissible purpose and in violation of 15 U.S.C. § 1681b(a).

**Plaintiff's July 1, 2024 Dispute to Experian**

116.   On or about July 1, 2024, Plaintiff called Experian and disputed the information on her Experian credit report.

117.   Plaintiff specifically disputed the information that does not belong to her.

118.   Plaintiff requested that Experian reinvestigate the disputed information, correct the reporting, and send her a corrected copy of her credit report.

### Experian's Dispute Reinvestigation

119.   On July 2, 2024, Experian issued a letter to Plaintiff wherein it provided Plaintiff with a copy of her credit report and informed her that Experian's dispute reinvestigation was still pending.

120.   Sometime before July 22, 2024, Experian removed all the accounts Plaintiff disputed.

121.   Experian also removed the inaccurate name, addresses, and Kohls CapOne inquiry.

122.   Experian did not remove the MDT/People Driven inquiries.

### Plaintiff's July 25, 2024 Dispute to Trans Union

123.   On or about July 25, 2024, worried that something was very wrong with her credit file, Plaintiff sent a dispute letter to Trans Union and disputed the inaccuracies.

124.   Plaintiff specifically disputed the Disputed Midland Account.

125.   Along with her dispute letter, Plaintiff enclosed a copy of her driver's license and Social Security card.

126.   Plaintiff requested that Trans Union reinvestigate the disputed information, correct the reporting, and send her a corrected copy of her credit report.

## Trans Union's Dispute Reinvestigation

127.   On or about July 29, 2024, Trans Union received Plaintiff's dispute and request that the inaccurate information be removed from her credit file.

128.   On August 15, 2024, Plaintiff received a letter from Trans Union wherein it communicated that it appreciated her contacting it and letting her know of her rights under the FCRA.

129.   However, thereafter, Plaintiff did not receive any further correspondence from Trans Union.

130.   Upon information and belief, Trans Union removed the inaccurate Midland Account as a result of its reinvestigation of Plaintiff's dispute.

## Midland's Violations of the FDCPA

131.   On July 7, 2021, Midland filed a complaint against a debtor, Linda Walker ("the Debtor").

132.   Upon information and belief, Midland had significant difficulties serving the Debtor.

133.   At some point, upon information and belief, Midland located an address associated with Plaintiff, ***** Pinehurst Avenue ("Pinehurst Address").

134.   Midland made attempts to serve the Debtor using the Pinehurst Address.

135.   Midland knew or should have known that the Pinehurst Address was not associated with the Debtor.

136.   After default judgment was entered, Midland secured a lien against the Debtor in the amount of $5,198.16.

137.   Thereafter, Midland sought a writ of garnishment with the Michigan Department of Treasury.

138.   Midland then made efforts to serve the writ of garnishment on the Debtor, but instead, utilized the Pinehurst Address.

139.   Once again, Midland knew or should have known the Pinehurst Address was not associated with the Debtor. This is evidenced by a Garnishee Disclosure dated April 15, 2022 that lists Plaintiff's first and last name and the Pinehurst Address.

140.   As a result of Midland's conduct, Plaintiff's taxes were garnished as described above.

141.   Throughout 2023, Midland also made repeated calls to Plaintiff. During those calls, Midland made false, misleading, and deceptive statements to Plaintiff which implied she was responsible for the Midland Account.

142.   Thereafter, Plaintiff sent proof of her identification to Midland to show Midland was calling the wrong person. This did not stop the calls.

143.   Plaintiff does not have a Midland account.

144.   Plaintiff does not owe any amount of money to Midland.

145.   Upon information and belief, no law or contract applies to permit Midland to collect the debt from Plaintiff.

146.   Plaintiff is not liable for the Midland Account.

147.   Midland knew or should have known that the Account was not associated with Plaintiff.

148.   Midland knew or should have known that Plaintiff did not owe the $5,198.16 balance.

149.   Midland knew or should have known that the Account was associated with an individual who was wholly distinguishable from Plaintiff.

150.   Midland also knew or should have known the Account did not belong to Plaintiff as she provided them with direct notice of such by sending Midland proof of her identification.

151.   In addition, as the debt collector for the Account, Midland knew or should have known that:

     (a)    Plaintiff and the debtor do not have the same middle or last name;

     (b)    Plaintiff and the debtor do not have the same date of birth;

      (c)    Plaintiff and the debtor do not have the same Social Security

            number;

      (d)    Plaintiff and the debtor do not have the same address(es); and

      (e)    Plaintiff and the debtor do not have the same phone number(s).

152.   Midland knew or should have known that it was attempting to collect on a debt Plaintiff did not owe.

153.   Midland knew or should have known that it was attempting to, and ultimately did, garnish taxes from Plaintiff for a debt she did not owe.

154.   Midland's collection of the debt not owed by Plaintiff was deceptive, misleading, unfair, unconscionable, and in violation of the FDCPA.

155.   Midland's conduct falsely represented and/or implied that Plaintiff owed a debt she was not liable for.

156.   Midland's conduct constituted deceptive means to collect or attempt to collect a debt Plaintiff did not owe.

157.   By garnishing Plaintiff's taxes, which did not fully satisfy the debt, Midland threatened to take further action that cannot be legally taken.

158.   Midland collected a debt from Plaintiff when it did not have express authorization by the agreement creating the debt and was not otherwise permitted by law to collect on the debt from Plaintiff.

159.  Plaintiff was shocked and confused by Midland's collection attempts and garnishment of her taxes for a debt she did not incur.

160.  Midland conceded its conduct was unlawful and in violation of the FDCPA; On July 31, 2024, Plaintiff received a check from Midland dated July 22, 2024, for $780.76.

## PLAINTIFF'S DAMAGES

### Plaintiff's Applies to JPMorgan Chase Bank

161.  On or about February 19, 2023, Plaintiff needed credit.  She completed and submitted a credit application to JPMorgan Chase Bank.

162.  Plaintiff anticipated that this credit application would be approved without issue.

163.  Plaintiff provided all of her personal identifying information and supporting documents and provided consent to JPMorgan Chase Bank to obtain Plaintiff's consumer reports and/or credit scores in order to determine Plaintiff's credit eligibility for financing purposes.

164.  On or about February 19, 2023, JPMorgan Chase Bank ordered a consumer report on Plaintiff from Experian.

165.  On or about February 19, 2023, Experian published and sold a consumer report about Plaintiff to JPMorgan Chase Bank in response to Plaintiff's credit application.

**JPMorgan Chase Bank Decisions Plaintiff's Credit Application**

166.   On or about February 19, 2023, JPMorgan Chase Bank received and reviewed Experian's consumer report about Plaintiff.

167.   Upon information and belief, Plaintiff was approved for the credit for which she applied.

168.   Upon information and belief, Plaintiff was approved on less favorable terms in reliance on information contained in the Experian consumer report about Plaintiff.

169.   Upon information and belief, Experian inaccurately published in the consumer report to JPMorgan Chase Bank several pieces of information that does not belong to Plaintiff.

170.   Upon information and belief, JPMorgan Chase Bank approved Plaintiff on less favorable terms due to Experian's inaccurate reporting.

**Plaintiff's Applies to American Express**

171.   On or about February 22, 2023, Plaintiff needed credit.  She completed and submitted a credit application to American Express.

172.   Plaintiff anticipated that this credit application would be approved without issue.

173.   Plaintiff provided all of her personal identifying information and supporting documents and provided consent to American Express to obtain

Plaintiff's consumer reports and/or credit scores in order to determine Plaintiff's credit eligibility for financing purposes.

174. On or about February 22, 2023, American Express ordered a consumer report on Plaintiff from the Credit Bureau Defendants.

175. On or about February 22, 2023, the Credit Bureau Defendants published and sold a consumer report about Plaintiff to American Express in response to Plaintiff's credit application.

**American Express Decisions Plaintiff's Credit Application**

176. On or about February 22, 2023, American Express received and reviewed the Credit Bureau Defendants' consumer reports about Plaintiff.

177. Upon information and belief, Plaintiff was approved for the credit for which she applied.

178. Upon information and belief, Plaintiff was approved on less favorable terms in reliance on information contained in the Credit Bureau Defendants' consumer reports about Plaintiff.

179. Upon information and belief, the Credit Bureau Defendants inaccurately published in the consumer reports to American Express several pieces of information that does not belong to Plaintiff.

180. Upon information and belief, American Express approved Plaintiff on less favorable terms due to the Credit Bureau Defendants' inaccurate reporting.

**Plaintiff's Applies to The Home Depot/CBNA**

181.  On or about March 9, 2023, Plaintiff needed credit.  She completed and submitted a credit application to The Home Depot/CBNA.

182.  Plaintiff anticipated that this credit application would be approved without issue.

183.  Plaintiff provided all of her personal identifying information and supporting documents and provided consent to The Home Depot/CBNA to obtain Plaintiff's consumer reports and/or credit scores in order to determine Plaintiff's credit eligibility for financing purposes.

184.  On or about March 9, 2023, The Home Depot/CBNA ordered a consumer report on Plaintiff from Experian.

185.  On or about March 9, 2023, Experian published and sold a consumer report about Plaintiff to The Home Depot/CBNA in response to Plaintiff's credit application.

**The Home Depot/CBNA Decisions Plaintiff's Credit Application**

186.  On or about March 9, 2023, The Home Depot/CBNA received and reviewed Experian's consumer report about Plaintiff.

187.  Upon information and belief, Plaintiff was approved for the credit for which she applied.

188. Upon information and belief, Plaintiff was approved on less favorable terms in reliance on information contained in Experian's consumer report about Plaintiff.

189. Upon information and belief, Experian inaccurately published in the consumer report to The Home Depot/CBNA several pieces of information that do not belong to Plaintiff.

190. Upon information and belief, The Home Depot/CBNA approved Plaintiff on less favorable terms due to Experian's inaccurate reporting.

### Plaintiff's Applies to Synchrony Bank/At Home

191. On or about May 21, 2023, Plaintiff needed credit. She completed and submitted a credit application to Synchrony Bank/At Home.

192. Plaintiff anticipated that this credit application would be approved without issue.

193. Plaintiff provided all of her personal identifying information and supporting documents and provided consent to Synchrony Bank/At Home to obtain Plaintiff's consumer reports and/or credit scores in order to determine Plaintiff's credit eligibility for financing purposes.

194. On or about May 21, 2023, Synchrony Bank/At Home ordered a consumer report on Plaintiff from the Credit Bureau Defendants.

195.   On or about May 21, 2023, the Credit Bureau Defendants published and sold a consumer report about Plaintiff to Synchrony Bank/At Home in response to Plaintiff's credit application.

**Synchrony Bank/At Home Decisions Plaintiff's Credit Application**

196.   On or about May 21, 2023, Synchrony Bank/At Home received and reviewed the Credit Bureau Defendants' consumer reports about Plaintiff.

197.   Upon information and belief, Plaintiff was approved for the credit for which she applied.

198.   Upon information and belief, Plaintiff was approved on less favorable terms in reliance on information contained in the Credit Bureau Defendants' consumer reports about Plaintiff.

199.   Upon information and belief, the Credit Bureau Defendants inaccurately published in the consumer reports to Synchrony Bank/At Home several pieces of information that do not belong to Plaintiff.

200.   Upon information and belief, Synchrony Bank/At Home approved Plaintiff on less favorable terms due to the Credit Bureau Defendants' inaccurate reporting.

**Plaintiff's Applies to Synchrony Bank/PayPal**

201.   On or about September 4, 2023, Plaintiff needed credit.  She completed and submitted a credit application to Synchrony Bank/PayPal.

202. Plaintiff anticipated that this credit application would be approved without issue.

203. Plaintiff provided all of her personal identifying information and supporting documents and provided consent to Synchrony Bank/PayPal to obtain Plaintiff's consumer reports and/or credit scores in order to determine Plaintiff's credit eligibility for financing purposes.

204. On or about September 4, 2023, Synchrony Bank/PayPal ordered a consumer report on Plaintiff from Trans Union.

205. On or about September 4, 2023, Trans Union published and sold a consumer report about Plaintiff to Synchrony Bank/PayPal in response to Plaintiff's credit application.

**Synchrony Bank/PayPal Decisions Plaintiff's Credit Application**

206. On or about September 4, 2023, Synchrony Bank/PayPal received and reviewed Trans Union's consumer report about Plaintiff.

207. Upon information and belief, Plaintiff was approved for the credit for which she applied.

208. Upon information and belief, Plaintiff was approved on less favorable terms in reliance on information contained in Trans Union's consumer report about Plaintiff.

209.   Upon information and belief, Trans Union inaccurately published in the consumer report to Synchrony Bank/PayPal several pieces of information that does not belong to Plaintiff.

210.   Upon information and belief, Synchrony Bank/PayPal approved Plaintiff on less favorable terms due to Trans Union's inaccurate reporting.

**Plaintiff's Applies to Synchrony Financial**

211.   On or about December 14, 2023, Plaintiff needed credit.  She completed and submitted a credit application to Synchrony Financial.

212.   Plaintiff anticipated that this credit application would be approved without issue.

213.   Plaintiff provided all of her personal identifying information and supporting documents and provided consent to Synchrony Financial to obtain Plaintiff's consumer reports and/or credit scores in order to determine Plaintiff's credit eligibility for financing purposes.

214.   On or about December 14, 2023, Synchrony Financial ordered a consumer report on Plaintiff from Trans Union.

215.   On or about December 14, 2023, Trans Union published and sold a consumer report about Plaintiff to Synchrony Financial in response to Plaintiff's credit application.

/ /

**Synchrony Financial Decisions Plaintiff's Credit Application**

216.   On or about December 14, 2023, Synchrony Financial received and reviewed Trans Union's consumer report about Plaintiff.

217.   Upon information and belief, Plaintiff was approved for the credit for which she applied.

218.   Upon information and belief, Plaintiff was approved on less favorable terms in reliance on information contained in Trans Union's consumer report about Plaintiff.

219.   Upon information and belief, Trans Union inaccurately published in the consumer report to Synchrony Financial several pieces of information that does not belong to Plaintiff.

220.   Upon information and belief, Synchrony Financial approved Plaintiff on less favorable terms due to Trans Union's inaccurate reporting.

**Plaintiff's Applies to The Home Depot/CBNA**

221.   On or about December 31, 2023, Plaintiff needed credit.  She completed and submitted a credit application to The Home Depot/CBNA.

222.   Plaintiff anticipated that this credit application would be approved without issue.

223.   Plaintiff provided all of her personal identifying information and supporting documents and provided consent to The Home Depot/CBNA to obtain

Plaintiff's consumer reports and/or credit scores in order to determine Plaintiff's credit eligibility for financing purposes.

224. On or about December 31, 2023, The Home Depot/CBNA ordered a consumer report on Plaintiff from Experian.

225. On or about December 31, 2023, Experian published and sold a consumer report about Plaintiff to The Home Depot/CBNA in response to Plaintiff's credit application.

### The Home Depot/CBNA Decisions Plaintiff's Credit Application

226. On or about December 31, 2023, The Home Depot/CBNA received and reviewed Experian's consumer report about Plaintiff.

227. Upon information and belief, Plaintiff was approved for the credit for which she applied.

228. Upon information and belief, Plaintiff was approved on less favorable terms in reliance on information contained in Experian's consumer report about Plaintiff.

229. Upon information and belief, Experian inaccurately published in the consumer report to The Home Depot/CBNA several pieces of information that do not belong to Plaintiff.

230. Upon information and belief, The Home Depot/CBNA approved Plaintiff on less favorable terms due to Experian's inaccurate reporting.

**Plaintiff's Applies to Synchrony Financial**

231. On or about February 21, 2024, Plaintiff needed credit. She completed and submitted a credit application to Synchrony Financial.

232. Plaintiff anticipated that this credit application would be approved without issue.

233. Plaintiff provided all of her personal identifying information and supporting documents and provided consent to Synchrony Financial to obtain Plaintiff's consumer reports and/or credit scores in order to determine Plaintiff's credit eligibility for financing purposes.

234. On or about February 21, 2024, Synchrony Financial ordered a consumer report on Plaintiff from Trans Union.

235. On or about February 21, 2024, Trans Union published and sold a consumer report about Plaintiff to Synchrony Financial in response to Plaintiff's credit application.

**Synchrony Financial Decisions Plaintiff's Credit Application**

236. On or about February 21, 2024, Synchrony Financial received and reviewed Trans Union's consumer report about Plaintiff.

237. Upon information and belief, Plaintiff was approved for the credit for which she applied.

238.   Upon information and belief, Plaintiff was approved on less favorable terms in reliance on information contained in Trans Union's consumer report about Plaintiff.

239.   Upon information and belief, Trans Union inaccurately published in the consumer report to Synchrony Financial several pieces of information that does not belong to Plaintiff.

240.   Upon information and belief, Synchrony Financial approved Plaintiff on less favorable terms due to Trans Union's inaccurate reporting.

### Plaintiff's Applies to Macy's/CBNA

241.   On or about May 15, 2024, Plaintiff needed credit.  She completed and submitted a credit application to Macy's/CBNA.

242.   Plaintiff anticipated that this credit application would be approved without issue.

243.   Plaintiff provided all of her personal identifying information and supporting documents and provided consent to Macy's/CBNA to obtain Plaintiff's consumer reports and/or credit scores in order to determine Plaintiff's credit eligibility for financing purposes.

244.   On or about May 15, 2024, Macy's/CBNA ordered a consumer report on Plaintiff from Experian.

245. On or about May 15, 2024, Experian published and sold a consumer report about Plaintiff to Macy's/CBNA in response to Plaintiff's credit application.

**Macy's/CBNA Denies Plaintiff's Credit Application**

246. On or about May 15, 2024, Macy's/CBNA received and reviewed Experian's consumer report about Plaintiff.

247. On or about May 15, 2024, Plaintiff learned she was denied by Macy's/CBNA.

248. Upon information and belief, Plaintiff was denied in reliance on information contained in Experian's consumer report about Plaintiff.

249. Upon information and belief, Experian inaccurately published in the consumer report to Macy's/CBNA several pieces of information that do not belong to Plaintiff.

250. Upon information and belief, Macy's/CBNA denied Plaintiff due to Experian's inaccurate reporting.

251. As a result of the "mixed file," the Credit Bureau Defendants made it difficult for Plaintiff to obtain credit.

252. At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

253.   At all times pertinent hereto, Defendants' conduct, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

254.   The Credit Bureau Defendants are aware of the shortcomings of their respective procedures and intentionally choose not to comply with the FCRA to lower their costs.  Accordingly, Credit Bureau Defendants' violations of the FCRA are willful.

255.   The Defendants have had years of notice in the form of federal lawsuits and consumer complaints. Despite it all, the Defendants failed to take any better steps to protect Plaintiff here.

256.   The internal policies and procedures of the Defendants do not appear to place any value on their obligations under the FCRA and/or FDCPA.

257.   As a result of Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of her right to keep her private financial information confidential; the loss of her right to information about who was viewing her private financial information and how her private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time disputing

and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

258.   Midland's collection efforts caused Plaintiff to suffer concrete and particularized injuries and harm. Midland injured Plaintiff by extracting and trying to extract money from Plaintiff that she did not owe. Furthermore, Midland placed Plaintiff in fear of future legal proceedings wherein Midland might further pursue the debt. Plaintiff was extremely distressed because she worried that she may have to pay off a debt she was not responsible for.

259.   As a direct result of Midland's actions, Plaintiff has suffered interference with daily activities and emotional distress, including, without limitation, emotional and mental anguish, loss of sleep, reputational harm, violation of privacy, humiliation, stress, anger, frustration, shock, embarrassment, and anxiety.

260.   Upon information and belief, Midland is aware of the shortcomings of its FDCPA procedures and intentionally chose not to comply with the FDCPA to lower costs.

261. Defendants' conduct also caused Plaintiff to waste a substantial amount of her time.

262. Defendants' conduct caused Plaintiff to be financial insecure and fear apply for credit.

263. As a result of Defendants' conduct, Plaintiff was concerned that her identity had been stolen and her privacy invaded.

264. Defendants' conduct was also distracting to Plaintiff when trying to fall asleep. Consequently, Plaintiff suffers from sleepless nights.

265. In addition, Defendants' conduct has made Plaintiff afraid to utilize credit.

## CLAIMS FOR RELIEF
### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim for Relief Against the Credit Bureau Defendants)

266. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

267. The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure *maximum possible*

> ***accuracy*** of the information concerning the individual about whom the
> report relates.

15 U.S.C. §1681e(b) (emphasis added).

268.   On at least one occasion, Defendants Trans Union and Experian prepared patently false consumer reports concerning Plaintiff.

269.   Defendants Trans Union and Experian mixed another consumer's personal and credit account information into Plaintiff's credit file, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

270.   Defendants Trans Union and Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

271.   As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of her right to keep her private financial information confidential; the loss of her right to information about who was viewing her private financial information and how her private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and

emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

272.   The Credit Bureau Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, the Credit Bureau Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

273.   Plaintiff is entitled to recover attorneys' fees and costs from the Credit Bureau Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
### 15 U.S.C. § 1681b(a)
**Furnishing a Credit Report Without a Permissible Purpose**
**(Second Claim for Relief Against the Credit Bureau Defendants)**

274.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

275.   This action involves the willful, knowing, and/or negligent violation of the FCRA relating to the dissemination of consumer credit and other financial information.

276.   Plaintiff is a "consumer" as defined by the FCRA.

277.   The Credit Bureau Defendants are consumer reporting agencies that furnish consumer reports as defined and contemplated by the FCRA.

278.   The FCRA prohibits any consumer reporting agency from furnishing a consumer report unless it has a permissible purpose enumerated under the FCRA, 15 U.S.C. § 1681b(a).

279.   On multiple occasions, the Credit Bureau Defendants furnished Plaintiff's credit report to various entities without a permissible purpose in response to credit applications of another, which did not involve Plaintiff, and which the Credit Bureau Defendants therefore had no reason to believe that those various credit-issuing entities intended to use Plaintiff's credit information in connection with a credit transaction involving Plaintiff, in violation of 15 U.S.C. § 1681b(a).

280.   The Credit Bureau Defendants violated 15 U.S.C. § 1681b(a) by selling Plaintiff's credit report to third parties, whom did not have a permissible purpose to Plaintiff's credit report, in relation to the credit application of an unrelated consumer.

281.   As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of her right to keep her private financial information confidential; the loss of her right to information about who was viewing her private financial information and how her private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from her

good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

282.   The Credit Bureau Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, the Credit Bureau Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

283.   Plaintiff is entitled to recover attorneys' fees and costs from the Credit Bureau Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT III
### Violation Of Fair Debt Collection Practices Act
### 15 U.S.C. § 1692e
### (First Claim for Relief Against Midland)

284.   Plaintiff incorporates by reference all of the above factual allegations of this Complaint as though fully stated herein.

285.    The FDCPA is a comprehensive regulatory scheme that Congress enacted to eliminate abusive, deceptive, and unfair debt collection practices by debt collectors and to promote consistent state action to protect consumers against debt collection abuses. 15 U.S.C. §§ 1692(a), (e).

286.    When Congress enacted the FDCPA in 1977, Congress had found that abusive debt collection practices harmed consumers by, among other things, increasing personal bankruptcy, marital instability, loss of employment, and invasion of privacy.

287.    Midland's misconduct was deliberately false, deceptive, misleading, unfair, unconscionable, and coercive, and attempted to unlawfully extract money from Plaintiff.

288.    Upon information and belief, Midland utilizes these false, deceptive, misleading, unfair, unconscionable, and coercive tactics as a matter of course when attempting to collect debts from consumers such as Plaintiff, despite the fact that Midland knows or should know that the debt did not belong to that consumer.

289.    Midland's misconduct violated 15 U.S.C. § 1692e(5) by taking action that could not legally be taken against Plaintiff as the debt was not hers.

290.    Midland's misconduct further violated 15 U.S.C. § 1692e(10) by making false and deceptive misrepresentations in the collection of the Midland Account.

291.   In this case, Plaintiff did not owe the amount that Midland attempted to collect.

292.   Midland had no evidence that Plaintiff did owe that balance before it engaged in collection efforts against Plaintiff.

293.   The Midland Account does not belong to Plaintiff.

294.   Despite this, Midland indicated to Plaintiff that it had the right to collect $5,198.16, and that Midland had the right to take legal action to recover that amount.

295.   Midland's misconduct was intentional. Defendant does not maintain procedures reasonably adapted to avoid such conduct, but rather intends the conduct.

296.   Midland's misrepresentations were made knowingly and with the intent to deceive and coerce the least sophisticated consumer. 15 U.S.C. 1692e(2)(A).

297.   Midland's misconduct was done intentionally with the purpose of coercing Plaintiff to pay an alleged debt that was not owed.

298.   Midland's misconduct also constituted false, deceptive, or misleading representations or means used by Midland in connection with the collection of a debt.

299.   Upon information and belief, no law or contract applies to permit Midland to collect the debt, which does not belong to Plaintiff, from Plaintiff.

300.   Thus, Midland attempted to collect amounts not owed from Plaintiff.

301.   As a result of the foregoing violations of the FDCPA, Plaintiff suffered injuries in fact, including emotional distress, embarrassment, humiliation, frustration, lost sleep, and interference with usual activities.

302.   Midland is liable to Plaintiff for actual damages, statutory damages, costs, and attorney fees.

**COUNT IV**
**Violation Of Fair Debt Collection Practices Act**
**15 U.S.C. § 1692f**
**(Second Claim for Relief Against Midland)**

303.   Plaintiff incorporates by reference all of the above factual allegations of this Complaint as though fully stated herein.

304.   Midland violated 15 U.S.C. § 1692f by using unfair or unconscionable means to collect a debt.

305.   Defendant Midland's unfair and unconscionable means include, without limitation:

(a)     Collecting a debt from Plaintiff that was not owed; and was therefore not due and owing or legally collectible.

306.   Defendant Midland's actions and statements were false, deceptive, or misleading representations or means used in connection with the collection of a debt.

307.   As a result of the foregoing violations of the FDCPA, Plaintiff suffered injuries in fact, including emotional distress, embarrassment, humiliation, frustration, lost sleep, and interference with usual activities.

308.   Defendant is liable to Plaintiff for actual damages, statutory damages, costs, and attorney fees.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

i. Determining that Defendants negligently and/or willfully violated the FCRA;

ii. Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii. Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA;

iv. Declaratory judgment that Midland violated the FDCPA;

v. Actual damages against Midland pursuant to 15 U.S.C. § 1692k(a)(1);

vi. Injunctive relief prohibiting Midland's abusive debt collection conduct in violation of the FDCPA;

vii. Statutory damages pursuant against Midland pursuant to 15 U.S.C. § 1692k(a)(2);

viii. Costs and reasonable attorney's fees against Midland pursuant to 15 U.S.C. § 1692k(a)(3); and

x. Granting further relief, in law or equity, as this Court may deem appropriate and just.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.


RESPECTFULLY SUBMITTED on this 1st day of November 2024.

By: <u>/s/ McKenzie Czabaj</u>
McKenzie Czabaj, AZ Bar No. 036711
**CONSUMER ATTORNEYS PLC**
8095 North 85th Way
Scottsdale, Arizona 85258
Phone: (480) 626-2376
Fax: (718) 715-1750
Email: mczabaj@consumerattorneys.com

*Attorneys for Plaintiff Linda Williams*