UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDA WILLIAMS,

    Plaintiff,

                                    Case No. 24-cv-12908

v.                                  Hon. Matthew F. Leitman

EXPERIAN INFORMATION
SOLUTIONS, INC., *et al.*,

    Defendants.

_____/

## ORDER (1) GRANTING DEFENDANT'S MOTION TO COMPEL ARBITRATION (ECF No. 23); (2) STAYING CLAIMS AGAINST DEFENDANT EXPERIAN INFORMATION SOLUTIONS, INC.; AND (3) TERMINATING DEFENDANT'S MOTION FOR A STAY OF DISCOVERY AS MOOT (ECF No. 24)

In this action, Plaintiff Linda Williams alleges, among other things, that Defendant Experian Information Solutions, Inc. ("Experian") violated the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* (the "FCRA"), by reporting inaccurate information on her credit report. Now before the Court is Experian's motion to compel Williams to arbitrate the claims she has asserted against Experian and to stay the action as to those claims pending the completion of arbitration. (*See* Mot., ECF No. 23.) For the reasons explained below, Experian's motion is **GRANTED**.

Experian has also filed a motion to stay discovery pending resolution of the motion to compel arbitration. (*See* Mot. to Stay Discovery, ECF No. 24.)  That motion is **TERMINATED AS MOOT** in light of the Court's ruling on the motion to compel arbitration and stay of the action as to the claims against Experian.

## I

## A

Williams is a resident of Oak Park, Michigan. (*See* Compl. at ¶ 38, ECF No. 1, PageID.12.)  In March 2024, the Michigan Department of Treasury notified her that her 2023 income tax refund of $721.00 was being withheld due to a debt she purportedly owed to Defendant Midland Credit Management, Inc. ("Midland"). (*See id.* at ¶¶ 79-80, PageID.20.)  Prior to receiving that notice, Williams was "completely unaware" of any accounts or debts with Midland. (*Id.* at ¶ 82.)  Accordingly, she began investigating how the debt came to be associated with her. (*See id.* at ¶¶ 84-87, PageID.20-21.)  After receiving little clarity from Midland, Williams "then called Identity Force, an identity protection service she had signed up for, and talked to a representative who reviewed her Trans Union credit report with her." (*Id.* at ¶ 88, PageID.21.)  The representative "informed [Williams] that the Midland Account was appearing on her Trans Union credit report" and "instructed [her] to review her Equifax and Experian credit reports to see if the Midland account was appearing on them as well." (*Id.* at ¶ 89-90.)

Williams then requested and "viewed a copy of her credit file from Experian." (*Id.* at ¶ 102, PageID.24.)  Williams "was dismayed by the appearance of several pieces of information that did not belong to [her] at all." (*Id.* at ¶ 104.)  For instance, the file reflected ten accounts and two addresses that "do not belong to [Williams]," a name she "has never utilized," a birth year that "is not the year in which [she] was born," a past employer for whom she "has never worked," and four account inquiries "relating to entities with whom [she] does not have an account relationship." (*Id.* at ¶¶ 105-111, PageID.24-27.)

Believing that Experian had mixed her credit file with "an unrelated consumer['s]," Williams called Experian to dispute the contents of her credit report and to request that Experian investigate and correct the credit report. (*Id.* at ¶¶ 114-118, PageID.27-28.)  "Sometime before July 22, 2024, Experian removed all the accounts [Williams] disputed," as well as the "inaccurate name, addresses, and [one credit] inquiry." (*Id.* at ¶ 120-121, PageID.28.)  But "Experian did not remove" the other three disputed inquiries. (*Id.* at ¶ 122.)

Williams alleges that Experian's erroneous credit file "made it difficult for [her] to obtain credit." (*Id.* at ¶ 251, PageID.45.)  She states that from February 19, 2023, to May 15, 2024, she was denied one line of credit due to a creditor's reliance on Experian's faulty report and "was approved less favorable terms" for at least three other lines of credit. (*Id.*, PageID.33-45.)  She further claims that she has

experienced "emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials," that Experian's "conduct caused [her] to be financial[ly] insecure" and "afraid to utilize her credit," and that Experian's handling of her credit report caused her to be "concerned that her identity was stolen and her privacy invaded." (*Id.* at ¶¶ 257, 261-265, PageID.46-48.)

**B**

On November 1, 2024, Williams filed this action against Experian, Midland, and Trans Union, LLC. (*See* Compl., ECF No. 1, PageID.1.)  Williams' Complaint alleges: (1) violations of the FCRA by all three Defendants; and (2) violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.*, by Midland. (*See id.*, PageID.1-2.)  All three Defendants filed Answers, and the Court later entered a stipulated order dismissing Williams' FCRA claim against Trans Union, LLC. (*See* Order, ECF No. 38.)

On February 7, 2025, Experian filed a motion to compel arbitration under Section 4 of the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "FAA"), and to stay the proceedings against it under Section 3 of the FAA until the arbitration was completed. (*See* Mot., ECF No. 23, PageID.323.)  Experian contends that Williams is obligated to arbitrate her claims pursuant to an arbitration agreement that Williams executed when she signed up for an online Experian account and, as part

of that process, enrolled in a service called "CreditWorks" (the name of Experian's credit monitoring service). More specifically, Experian says that "when [Williams] enrolled in CreditWorks, she [] agreed to the Terms of Use Agreement governing that service." (*Id.*, PageID.338.) And Experian highlights that the Terms of Use Agreement included an agreement to arbitrate all claims against Experian, including claims under the FCRA.[1] (*See* Terms of Use Agmt., ECF No. 23-4, PageID.376-383.)

In support of its motion, Experian provided an affidavit from Dan Smith, the Director of Product Operations for ConsumerInfo.com, an Experian affiliate also known as Experian Consumer Services (the "Smith Declaration"). (*See* Smith Decl. at ¶ 1, ECF No. 23-1, PageID.354.) In his affidavit, Smith described his duties in that role as follows:

> These duties require that I be familiar with, among other things, how consumers enroll [in Creditworks], the forms they must complete to enroll, as well as the Terms of Use governing such services. My duties also require that I am familiar with [Experian Consumer Service's] electronic databases that store consumer enrollment information, including the webpages a consumer would have encountered to complete their enrollment into CreditWorks, the personally identifiable information entered when enrolling, which buttons the consumer would have clicked on in the enrollment process, and date

---

[1] The arbitration agreement also specifically applies to disputes with "affiliates" of Experian Consumer Services, including the named Defendant here, Experian Information Solutions, Inc. (*See* Mot., ECF No. 23, PageID.338-339.)

and time of the consumer's acceptance of the Terms of
Use.

(*Id.*, PageID.354-355.)

Smith declared that he had reviewed Experian's "membership enrollment data" and determined that Williams "enrolled in CreditWorks" on July 2, 2024. (*Id.* at ¶ 3, PageID.356.)   Smith then attested that he was familiar with the CreditWorks enrollment process. (*See id.* at ¶ 1, PageID.354.)   He outlined that process and explained that Williams could not have completed it without agreeing to Experian's Terms of Use, including the arbitration provision therein. (*See id.* at ¶¶ 3-5, PageID.356-357.)

Smith explained that "[i]n order to successfully enroll [in CreditWorks]," Williams "had to complete a single webform." (*Id.* at ¶ 3, PageID.356.)   That webform, which Smith attached to his declaration, looked like this:

**•experian** Member? Sign in.

## Tell us about yourself

**First Name**

**Last Name**

**Current Street Address**

**Apt, Unit**

**ZIP Code**     **City**

**State**
▲▼

Have you lived at this address for 6 months or more?   ● Yes   ○ No

### Create Your Account

**Email Address**

This will be your username

**Password**
👁

**What is the main reason you visited Experian today?**

Please select an option
▲▼

*Credit score calculated based on FICO® Score 8 model. Your lender or insurer may use a different FICO® Score than FICO® Score 8, or another type of credit score altogether. Learn more.

By clicking "Create Your Account": I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy.

I authorize ConsumerInfo.com, Inc., also referred to as Experian Consumer Services ("ECS"), to obtain my credit report and/or credit score(s), on a recurring basis to:

- Provide my credit report (and/or credit score) to me for review while I have an account with ECS.
- Notify me of other products and services that may be available to me through ECS or through unaffiliated third parties.
- Notify me of credit opportunities and advertised credit offers.

I understand that I may withdraw this authorization at any time by contacting ECS.

**Create Your Account**

### When you register today, you'll get:

✓ Free Experian Credit Report and FICO® Score

✓ Increase your FICO® Score with Experian Boost

✓ Report and Score Refreshed Every 30 Days On Sign In

✓ FICO® Score Monitoring with Experian Data

✓ Experian Credit Monitoring and Alerts

✓ Free Dark Web Surveillance Report

✓ Free Personal Privacy Scan

✓ Credit Cards and Loans Matched for You

👍

#### Always Free. No Impact to Your Score

No purchase or credit card required. Checking your Experian credit report will never impact your credit scores.

🔒

#### Safe and Secure

The information you provide will be transferred to us through a private, secure connection.

**Entrust**      ☑ **TrustedSite**
                  CERTIFIED SECURE

---

Terms of Use Agreement    Privacy Policy    Contact Us

☑ **TrustedSite**
CERTIFIED SECURE

© 2024 Experian. All rights reserved.

Experian and the Experian trademarks used herein are trademarks or registered trademarks of Experian Information Solutions, Inc., ConsumerInfo.com, Inc. or its affiliates. Other product or company names mentioned herein are the property of their respective owners. Licenses and Disclosures

7

(*Id.*, PageID.362.)  As the text in the box at the upper right corner of the form indicates, a person completing the form agreed to receive Experian's "Credit Monitoring" services – *i.e.*, the suite of services that is "called CreditWorks." *Oatway v. Experian Info. Sols., Inc.*, No. 2:24-cv-00523, 2024 WL 4879822, at \*1 (W.D. Wash. Nov. 25, 2024).

Smith highlighted that the form disclosed, in bold text, that "[b]y clicking 'Create Your Account': I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy." (Smith Decl. at ¶ 3, ECF No. 23-1, PageID.356.)  Smith further noted that the words "Terms of Use Agreement" were offset in "bold blue text," and he explained that Williams could have "view[ed] the entire text of the Terms of Use Agreement" by clicking on that blue text (which was a hyperlink to the Terms of Use Agreement). (*Id.* at ¶ 4, PageID.356-357.)  He then explained that the Terms of Use Agreement "contain[s] an Arbitration Agreement, which requires" a CreditWorks member to arbitrate all claims that "relate to" or "arise out of" the member's enrollment in CreditWorks. (*Id.* at ¶ 6, PageID.357; *see also* Terms of Use Agmt., ECF No. 23-4, PageID.376-383.)  Finally, Smith noted that Williams "had to click the 'Create Your Account' button on the webform in order to enroll [in CreditWorks]." (Smith Decl. at ¶ 3, ECF No. 23-1, PageID.356.)  Indeed, he said that Williams "would not have been

able to successfully enroll in CreditWorks unless she clicked that button." (*Id.* at ¶ 5, PageID.357.)

Simply put, Smith explained that Williams could not have enrolled in CreditWorks without agreeing to the arbitration agreement contained in the Terms of Use Agreement.  Based upon Smith's declaration, Experian argues that Williams must arbitrate her claim against Experian because she (1) "had clear notice of the Terms of Use [Agreement and the arbitration provision included in that agreement] at the time she enrolled" in CreditWorks; (2) "was admonished that, by clicking an adjacent button, she was agreeing to be bound by the Terms of Use [Agreement];" and (3) "clicked the button, thereby manifesting her assent to the Terms of Use [Agreement]." (Mot., ECF No. 23, PageID.344-345.)[2]

In response to Experian's motion, Williams admits that she "signed up for an online Experian account." (Williams Decl. at ¶ 3, ECF No. 25-2, PageID.538.)  But she nonetheless contends that she should not be compelled to arbitrate her claims against Experian for several reasons.  First, she argues that Experian has failed to show that she agreed to the arbitration provision in the Terms of Use Agreement

---

[2] Experian also argues that it may properly enforce the arbitration agreement as a party or third-party beneficiary, and that an arbitrator should decide the scope and enforceability of the arbitration agreement. (*See* Mot., ECF No. 23, PageID.345-350.)  Williams does not dispute these issues in her response. (*See generally* Resp. to Mot., ECF No. 25, PageID.514-531.)  Therefore, the Court addresses the only disputed issue: the existence of an agreement to arbitrate.

because the Smith Declaration – which Experian uses to show how she accepted that agreement – is inadmissible due to Smith's lack of personal knowledge. (*See* Resp. to Mot., ECF No. 25, PageID.514-526.)  Second, she asserts that even if Smith's declaration is admissible, there is still a question of fact as to whether a valid arbitration agreement exists because she does not recall signing up for CreditWorks or clicking anything giving her assent to arbitration. (*See* Williams Decl. at ¶¶ 2-5, ECF No. 25-2, PageID.537-538.)  Finally, she contends the arbitration agreement Experian seeks to enforce is not supported by "mutual assent," as required "under the laws of Michigan." (Resp. to Mot., ECF No. 25, PageID.527.)

For the reasons explained below, the Court concludes that Experian has met its burden to demonstrate the existence of a valid agreement to arbitrate and has shown mutual assent to that agreement.

## II

The FAA provides that "[a] written agreement to arbitrate disputes arising out of a transaction in interstate commerce 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003) (quoting 9 U.S.C. § 2).  This language "[m]anifest[s] a liberal federal policy favoring arbitration agreements." *Id.* (internal quotation marks and citation

omitted).  Indeed, the FAA "was designed to override judicial reluctance to enforce arbitration agreements, to relieve court congestion, and to provide parties with a speedier and less costly alternative to litigation." *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000).

"Section 4 of the FAA [(9 U.S.C. § 4)] sets forth the procedure to be followed by [a] district court when presented with a petition to compel arbitration." *Great Earth Cos., Inc. v. Simons*, 288 F.3d 878, 888 (6th Cir. 2002).  That section provides, in relevant part, that:

> [a] party aggrieved by the . . . refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement. . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . . If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof.

9 U.S.C. § 4.

Where, as in this case, the parties seeking and opposing arbitration ask the Court to consider "documents beyond the [C]omplaint," the Court must resolve the motion to compel arbitration under "the framework of Rule 56." *Memmer v. United Wholesale Mortg., LLC*, 135 F.4th 398, 404 (6th Cir. 2025) (citing *Boykin v. Fam. Dollar Stores of Mich., LLC*, 3 F.4th 832, 838 (6th Cir. 2021)).  "Under this

framework, [the party seeking to compel arbitration] bears the initial burden to produce evidence sufficient to allow a trier of fact to conclude that the parties entered a contract to arbitrate." *Id.* "If [the party moving for arbitration] does that, the burden shifts to [the party opposing arbitration] to place the validity of the agreement at issue." *Id.* In order to carry that burden, "the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate." *Great Earth Cos.*, 288 F.3d at 889 (citation omitted). "If [this Court] is satisfied that the agreement to arbitrate is not 'in issue,' it must compel arbitration." *Id.* However, "[i]f the validity of the agreement to arbitrate is 'in issue,' the [C]ourt must proceed to a trial to resolve the question." *Id.*

"Because arbitration agreements are fundamentally contracts, [courts] review the enforceability of an arbitration agreement according to the applicable state law of contract formation" – in this case, the law of Michigan. *Hergenreder v. Bickford Senior Living Grp., LLC*, 656 F.3d 411, 416 (6th Cir. 2011) (quotation omitted). The Sixth Circuit has summarized the relevant Michigan contract law as follows:

> Under Michigan law, "Before a contract can be completed, there must be an offer and acceptance." *Pakideh v. Franklin Commercial Mortg. Grp., Inc.,* 213 Mich.App. 636, 540 N.W.2d 777, 780 (1995); *see also Kamalnath v. Mercy Mem'l Hosp. Corp.,* 194 Mich.App. 543, 487 N.W.2d 499, 503 (1992) ("A contract is made when both parties have executed or accepted it, and not before."). "An offer is defined as the manifestation of

12

willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Kloian v. Domino's Pizza L.L. C.,* 273 Mich.App. 449, 733 N.W.2d 766, 770 (2006) (internal quotation marks omitted). Similarly, "an acceptance sufficient to create a contract arises where the individual to whom an offer is extended manifests an intent to be bound by the offer, and all legal consequences flowing from the offer, through voluntarily undertaking some unequivocal act sufficient for that purpose." *Id.* at 771 (quotation marks omitted; alteration removed).

Beyond these requirements, the elements of a valid contract in Michigan are: "(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Hess v. Cannon Twp.,* 265 Mich.App. 582, 696 N.W.2d 742, 748 (2005) (quotation marks omitted). Whether the parties have mutually agreed to be bound "is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Kloian,* 733 N.W.2d at 771 (quotation marks omitted); *see also Breitenbeck v. Merillat Indus., L.L.C.,* No. 258135, 2006 WL 859421, at *2 (Mich.Ct.App. Apr. 4, 2006) (unpublished opinion) (stating that Michigan courts look to whether the parties "manifested an intent to be bound by [a contract's] terms"). The party seeking to enforce a contract has the burden of showing that it exists. *Kamalnath,* 487 N.W.2d at 504 (quoting *Hammel v. Foor,* 359 Mich. 392, 102 N.W.2d 196, 200 (1960)).

*Id.* at 417.

## III

Experian has presented sufficient evidence to support a finding that the parties entered into a binding agreement to arbitrate, and Williams has failed to call

that evidence into question and/or to present sufficient countervailing evidence to create a material dispute of fact as to whether she agreed to arbitrate. The Court will therefore compel the parties to arbitrate Williams' claims.

## A

Experian has carried its "initial burden to produce evidence sufficient to allow a trier of fact to conclude that the parties entered a contract to arbitrate." *Memmer*, 135 F.4th at 404. That evidence is found in the Smith Declaration. As set forth above, Smith explained that (1) Experian's membership enrollment data reflects that Williams signed up for CreditWorks on July 2, 2024, and (2) she could not have done so without agreeing to Experian's Terms of Use, including the agreement to arbitrate contained therein. As numerous courts across the country have concluded, that evidence is sufficient to support a finding that the parties entered into a binding arbitration agreement. *See, e.g.*, *Acorin v. Experian Info. Sols., Inc.*, No. 24-cv-00036, 2024 WL 5011950, at *4-5 (S.D. Cal. Dec. 6, 2024) (holding that a declaration much like Smith's warranted a finding that the plaintiff had agreed to arbitrate claims against Experian); *Oatway*, 2024 WL 4879822, at *4-5 (same); *George v. Experian Info. Sols. Inc.*, No. 23-cv-02303, 2024 WL 3013146,

14

at *7-8 (D. Md. June 14, 2024) (same); *Hanson v. Experian Info. Sols. Inc.*, No. 1:23-CV-4564, 2024 WL 2974160, at *4-11 (N.D. Ga. June 12, 2024) (same).[3]

Williams resists that conclusion. She contends that the Smith Declaration is not sufficient to satisfy Experian's burden because it is "inadmissible." (Resp. to Mot., ECF No. 25, PageID.514.) More specifically, she says that the Court may not consider the Smith Declaration because Smith lacks "personal knowledge" as to what Williams actually "accessed, saw, or clicked on July 2, 2024." (*Id.*, PageID.518-519.) Williams insists that Smith could not possibly have first-hand knowledge of what she did during the enrollment process because he "was not present when [she] allegedly agreed to the terms and conditions with which Experian seeks to bind [her]." (*Id.*, PageID.520.) Williams further faults Smith for not specifically identifying in his declaration the documents that he reviewed and relied upon. (*See id.*, PageID.518.)

As support for her position, Williams cites three out-of-circuit district court decisions in which courts have adopted her view that a declaration much like the Smith Declaration is insufficient to establish an agreement to arbitrate: *Austin v. Equifax Info. Servs., LLC*, No. 3:22cv707, 2023 WL 8646275 (E.D. Va. Dec. 14, 2023); *Newton v. Experian Info. Sols., Inc.*, No. CV 623-059, 2024 WL 3451895

---

[3] Experian cites myriad other cases in which courts have reached the same conclusion. (*See* Mot., ECF No. 23, PageID.335-338.)

(S.D. Ga. July 18, 2024); *Lamonaco v. Experian Info. Sols., Inc.*, No. 6:23-cv-1326, 2024 WL 1703112 (M.D. Fla. Apr. 19, 2024). However, after Williams filed her response to Experian's motion, all three of these decisions were reversed. *See Austin v. Experian Info. Sols., Inc.*, 184 F.4th 194 (4th Cir. 2025); *Newton v. Experian Info Sols., Inc.*, No. 24-12398, 2025 WL 2102084 (11th Cir. July 28, 2025); *Lamonaco v. Experian Info. Sols., Inc.*, 141 F.4th 1343 (11th Cir. 2025).

The Fourth Circuit's decision in *Austin* explains why Williams' attack on the Smith Declaration (which essentially mirrors the declaration in *Austin*) falls short and why such a declaration is sufficient to establish an agreement to arbitrate:

> Second, we disagree that Williams failed to demonstrate personal knowledge. The information Experian was required to demonstrate (and for which it submitted Williams's declaration) was the existence of a binding contract to submit disputes to arbitration. To do so, it needed to show that Austin agreed to the terms of use, i.e., that he enrolled in CreditWorks, and the content of those terms of use when he did so. So, the Williams testimony was in turn offered to confirm that Austin had indeed enrolled and the appearance of the website.
>
> Williams averred that in his role of "VP, Business Governance" of ECS — the Experian affiliate that operates CreditWorks — he is familiar with "marketing, advertising and sales of [ECS] consumer credit products, including services that consumer enroll [sic] in at Experian websites, as well as the Terms of Use governing such services." J.A. 120. Williams has been employed by ECS since 2001. He explained he had gained the personal knowledge asserted in his declaration through his day-to-day work responsibilities, and from the "review of pertinent documents maintained as business records by

16

[ECS] in the course and scope of" its business. *Id.* Williams then, in further detail, describes the appearance of the CreditWorks enrollment page, what a user does on that page — such as entering their personal information and links that they click. He also averred that Austin had enrolled in CreditWorks on May 3, 2020.

On this record, Williams has "properly demonstrated his own knowledge." *Melo v. Zumper, Inc.*, 439 F. Supp. 3d 683, 694 (E.D. Va. 2020). Our read of the district court's order suggests that it would have required Williams to demonstrate that he possessed a more technical understanding of the software used by the company to record customer information. But Williams's declaration "does not include discussion of any hyper-technical aspects or functions" of the CreditWorks enrollment page "that would require significant technical expertise not normally possessed" by a Business Governance officer. *Id.* And perhaps our reasoning would differ if that were the case. It would be a stretch in logic to conclude that Williams has demonstrated personal knowledge of, say, the contents of computer code developed to support the ECS website. But instead here, the operative finding is whether and when Austin enrolled in CreditWorks, and if so, what terms of use, if any, did he agree to. And nothing in the record before us suggests that Wil[l]iams, VP of Business Governance at ECS, lacked personal knowledge of whether someone signed up for a free product offered by the company, the date that they did so, and the terms of use in effect at that time. *See* Fed. R. Evid. 602 ("Evidence to prove personal knowledge may consist of the witness's own testimony.").

Finally, our observations above are underlined by a presumption we have recognized that "*ordinarily*, officers would have personal knowledge of the acts of their corporations." *Catawba*, 978 F.2d at 1342 (emphasis added). In *Bryant*, we declined to exclude affidavits where they contained "sufficient information" to establish personal knowledge in the absence of evidence

that the affiant was not competent to testify. *See* 288 F.3d at 135 n.9. And we have also noted the same regarding the president of a small business for 30 years with respect to billing practices of that business. *See In re Apex*, 190 F.3d at 635.

Here, a corporate officer overseeing Business Governance — which, based upon evidence in opposition submitted by Austin includes responsibility for "risk and regulatory management" as well as those duties described by Williams himself — would presumably be competent to testify regarding the registration of a user on a particular date and the terms of use in force at the time. J.A. 533. And against Williams's assertions of his own personal knowledge in his sworn statement, Austin does not offer evidence that shows he lacked that knowledge or was required to possess "hyper-technical" information regarding the enrollment process. *Melo*, 439 F. Supp. 3d at 694. So although some showing of personal knowledge must be made in the admission of any testimony, "the proponent's burden is a minimal one." 1 McCormick on Evid. § 10 (9th ed. 2025). In light of the straightforward factual showings Experian sought to make through the Williams declaration and the contents of the Williams declaration, we conclude that burden was met here.

*Austin*, 148 F.4th at 204–05 (4th Cir. 2025).

The Eleventh Circuit reached the same conclusion in *Lamonaco*, 141 F.4th at 1348. That court rejected an attack like that brought by Williams here against a declaration much like the Smith Declaration. It concluded that the "declaration and supporting exhibits [*i.e.*, the Terms of Use Agreement] made it 'more likely than not' that [the plaintiff] agreed to the Terms of Use [Agreement]," which included an agreement to arbitrate. *Id.*

18

In sum, the overwhelming weight of authority holds that a declaration like the Smith Declaration is sufficient to establish the existence of an agreement to arbitrate. Williams has not cited any still-viable authority to the contrary. The Court finds the clear majority approach to be persuasive and follows it here. Consistent with that approach, the Court concludes that Experian satisfied its initial burden to establish the existence of an agreement to arbitrate when it submitted the Smith Declaration.

**B**

Williams has failed to present sufficient opposing evidence to create a factual dispute as to whether she agreed to arbitrate her claims against Experian. She presents her own declaration, but her sworn statements therein fall short. In her declaration, Williams does not categorically deny that she enrolled in CreditWorks and agreed to the Terms of Use Agreement containing the arbitration provision. Instead, she says that she "do[es] not recall signing up for an account with CreditWorks" and that "to the best of her knowledge," she "ha[s] not ever personally signed up for any account with CreditWorks." (Williams Decl., ECF No. 25-2, PageID.537.) These statements are insufficient to create a factual dispute because they are not "unequivocal denial[s]" that she signed up for CreditWorks and assented to the Terms of Use Agreement. *Boykin v. Fam. Dollar Stores of Mich., LLC*, 3 F.4th 832, 840 (6th Cir. 2021) (identifying the type of denial that is

sufficient to create a factual dispute as to whether a party agreed to arbitrate its claims).[4]   Moreover, irrespective of whether Williams recalls enrolling in CreditWorks specifically, she *admits* that she signed up for an Experian account (*see* Williams Decl. at ¶ 3, ECF No. 25-2, PageID.538), and, as further explained above, she could not have done so without clicking the "Create My Account" tab and thereby accepting the Terms of Use Agreement – including, of course, the arbitration provision.   On this record, there is simply no factual dispute as to whether Williams agreed to arbitrate her claims – she did.

Williams counters that her statements in her declaration are sufficient to create material factual dispute as to whether she assented to the arbitration provision in the Terms of Use Agreement.   In support, Williams relies on the unpublished decision in *Tu v. Experian Info. Sols., Inc.*, No. 24-cv-1221, 2025 WL 1134612 (S.D. Cal., April 16, 2025) (denying Experian's motion to compel arbitration on the basis that there was a factual dispute as to whether the plaintiff agreed to arbitrate).[5]

---

[4] See also *Memmer*, 135 F.4th at 405 (explaining that a party's sworn statement that she "do[es] not recall signing" an agreement containing an arbitration provision is insufficient to create a factual dispute as to whether the party entered into the agreement); *Gavette v. United Wholesale Mortg., LLC*, No. 24-1557, 2025 WL 318224, at *3 (6th Cir. Jan. 28, 2025) (holding that a party's sworn statement that he "does not remember signing an arbitration clause" was insufficient to create a factual dispute as to the existence of the agreement); *Tucker v. United Wholesale Mortg., Inc.*, No. 24-1595, 2025 WL 1082316, at *3 (6th Cir. Apr. 10, 2025) (same).

[5] While the court in *Tu* found a factual dispute as to whether the plaintiff agreed to arbitrate, the court rejected plaintiff's argument that a declaration from Dan Smith

But there is a critical difference between the declaration deemed sufficient to create a factual dispute in *Tu* and Williams' declaration here.  In the *Tu* declaration, the plaintiff contended that, to the best of her knowledge, she had never signed up for CreditWorks *or for an Experian account. See Tu*, 2025 WL 1134612, at *7 ("Plaintiff also states: 'I do not recall signing up for an account with Experian.com.'")  She claimed that she had merely requested a copy of her credit report. *See id.*  The court ultimately concluded that compelling arbitration would be premature because "Plaintiff disputes the creation of the underlying account with Experian *and* CreditWorks." *Id.* at *8 (emphasis added).  Here, in sharp contrast, Williams *admits* that she created an Experian account – something she could not have done without agreeing to the arbitration provision in the Terms of Use Agreement.  The decision in *Tu* thus does not support Williams' contention that the Court should deny Experian's motion to compel arbitration.

## C

Finally, Williams argues that even if the Smith Declaration is admissible and even if that declaration establishes the existence of an agreement to arbitrate, the agreement is unenforceable "under the laws of Michigan" due to a lack of "mutual assent." (Resp. to Mot., ECF No. 25, PageID.527.)  The Court disagrees.

---

– that mirrored the Smith Declaration in this case – was inadmissible for lack of personal knowledge. *See Tu*, 2025 WL 1134612, at *4–7.

Williams argues that she could not have validly assented to the Terms of Use Agreement – including the arbitration provision therein – because the contracting process Experian utilized is misleading as to the scope of the agreement that is being formed. She says that Experian uses a hybrid "clickwrap" and "browsewrap" agreement that confuses consumers in the same manner as the agreement that the Seventh Circuit held unenforceable in *Sgouros v. TransUnion Corp*, 817 F.3d 1029 (7th Cir. 2016). (*See* Resp. to Mot., ECF No. 25, PageID.526-531.) But the agreement in *Sgouros* was materially different from the agreement that Williams entered into with Experian.

*Sgouros* involved an arbitration agreement with Trans Union – another credit reporting entity – that was "buried" in a "small scroll box" that appeared during the second step of a three-step online sign-up process. *See Sgouros*, 817 F.3d at 1032–33. Further down the page from the scroll box, users had to click a button that said "I Accept & Continue to Step 3," but the text immediately preceding that button did not "require [users] to first click on the scroll box or to scroll down to view its complete contents, nor did it in any other way call [their] attention to any arbitration agreement." *Id.* at 1033. Instead, "[t]he block of bold text below the scroll box told the user that clicking on the box constituted his authorization for TransUnion to obtain his personal information." *Id.* at 1035. The Seventh Circuit, applying Illinois contract law, held that Trans Union's sign-up process did not establish mutual

22

assent.   The court noted that Trans Union's process "actively misleads the customer" because the block of text below the scroll box "says nothing about contractual terms." *Id.*  For support, the court cited with approval cases in which other courts had upheld hyperlinked agreements that were accompanied by "a clear prompt directing the user to read" their terms. *Id.* (collecting cases).

Here, unlike the agreement hidden in the scroll box in *Sgouros*, Experian's enrollment process conspicuously presented the Terms of Use Agreement to Williams in a bolded, blue hyperlink, and notified Williams in the text above the "Create Your Account" button that she was assenting to the Terms of Use Agreement by clicking that button.  And when Williams signed up for her Experian account, she received the following disclosure in bolded text immediately above the "Create Your Account" button: "By clicking 'Create Your Account': I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy." (*See* Smith Decl., ECF No. 23-1, PageID.356, 362.)  The phrase "Terms of Use Agreement" was a blue hyperlink that linked to the full text of the Terms of Use Agreement, including the arbitration provision. (*See id.* PageID.356-357, 362, 376.)  Courts in this circuit have routinely held that this type of notice is not misleading.  *See Anderson v. Amazon.com, Inc.*, 490 F.Supp.3d 1265 (M.D. Tenn. 2020) (compelling arbitration for plaintiff who clicked "Place Order" button below the statement: "By clicking Place Order, you agree to Walmart's Updated

[(linked)] Privacy Policy and Terms of Use"); *Lee v. Panera Bread Co.*, No. 1:22-cv-11958, 2023 WL 2606611 (E.D. Mich. Mar. 6, 2023) (compelling arbitration for plaintiff who clicked "Start My Subscription" button below the statement: "By clicking the 'Start My Subscription' button below, you . . . further agree to Panera's [(linked)] Terms and Conditions, Terms of Use, and Privacy Policy . . ."). Here, the conspicuous Terms of Use Agreement and clear statement indicating that clicking the "Create Your Account" button constituted an agreement with that Terms of Use Agreement put Williams on reasonable notice that creating an Experian account would manifest assent to the linked terms.

In *Austin*, the Fourth Circuit similarly rejected a comparison to *Sgouros* and upheld Experian's arbitration agreement. There, the court explained:

> The CreditWorks enrollment page that a user like Austin would have seen is much different than TransUnion's, making this case readily distinguishable from *Sgouros*. . . . The CreditWorks enrollment page stated, in bold text, that "[b]y clicking 'Create Your Account': I accept and agree to your Terms of Use Agreement." J.A. 125. And as previously indicated, the words "Terms of Use Agreement" were set off in blue text "on an uncluttered background," *Dhruva*, 131 F.4th at 152, close to the portions of the form that a customer had to fill out and click. We conclude here, as we did in *Dhruva*, that "[n]othing about the website design or layout obscure[d] the conspicuous location of the Terms of Use hyperlink." *Id.* Indeed, Austin "did not need to 'scroll[] down' or 'go exploring' to find out there were terms of use in the first place." *Id.* at 153 (quoting *Marshall*, 112 F.4th at 219–20).

*Austin*, 148 F.4th at 207. Under those circumstances, the court found that Austin had assented to Experian's Terms of Use. *See id.* at 208–09. The same is true here. And because Williams assented to the Terms of Use Agreement, Experian may enforce against her the arbitration provision included in that agreement.

## IV

For all of the reasons explained above, the Court **GRANTS** Experian's motion to compel arbitration (ECF No. 23) and **STAYS** Williams' claims against Experian pending completion of the arbitration.[6] *See Arabian Motors Grp., W.L.L. v. Ford Motor Co.*, 19 F.4th 938, 941–43 (6th Cir. 2021) (holding that district court should ordinarily stay claims after compelling arbitration under the FAA). Experian's motion to stay discovery (ECF No. 24) is **TERMINATED AS MOOT.**

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: October 22, 2025

---

[6] Williams' claims against Midland are not subject to arbitration, and Williams and Midland shall continue to litigate those claims in this Court pursuant to the schedule that the Court set on October 9, 2025. (*See* Order, ECF No. 44.)

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on October 22, 2025, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126